## Chicago Terminal Transfer R. R. Co. v. Agnes Gruss.

1. WILLFUL NEGLIGENCE—*Defined.*—Willful or wanton negligence is defined to be such a gross want of care and regard for the rights of others as to justify the presumption of willfulness or wantonness.

2. TRESPASSERS—*Where They May Recover for Injuries Inflicted upon Them.*—When the engineer in charge of a railroad train is guilty of a

want of ordinary care to avoid injury to a trespasser after discovering his presence upon the right of way, such trespasser will be entitled to recover damages for the injury sustained.

. 3.   APPELLATE COURT PRACTICE—*When the Right to Object to Excessive Damages is Waived.*—When the question of excessive damages is not raised in the appellant's brief it will be deemed as waived.

**Trespass on the Case,** for personal injuries. Appeal from the Superior Court of Cook County; the Hon. THEODORE BRENTANO, Judge presiding. Heard in this court at the October term, 1901. Affirmed. Opinion filed June 23, 1902.

**Statement.**—This is an appeal from a judgment for $6,000 recovered by appellee for personal injuries. June 25, 1899, appellee, who was then about sixteen years of age, became a passenger on one of appellant's trains at Chicago to go to Blue Island, in Cook County, Illinois. It was a sort of pleasure excursion, and appellee purchased a round-trip ticket, which included her passage to Blue Island and return. The train reached the depot at Blue Island about 2:30 or three o'clock P. M., and was due to leave there for Chicago at five o'clock P. M. The preponderance of the evidence is, as we think, that the train consisted of about eighteen cars. The Blue Island depot, where the train stopped, is some distance north of a trestle railroad bridge, one witness says about 200 feet. The bridge is about 254 feet long. The ties are about twelve feet in length, and the rails are laid immediately on them. There is no planking, and the distance between the ties is about a foot. The bridge spans a creek. Appellant's civil engineer testified that at the south end of the trestle it is twelve and a half feet from the top of the tie to the ground; at a point sixteen feet north from there it was fourteen and a half feet from the ground; that the creek is nearer the north than the south end of the bridge, and that the ground declines gradually from the south end of the trestle to the creek. The train was crowded with passengers, so much so that, as testified by one of appellant's witnesses, eight collectors were required. When the train reached the depot, it ran onto a switch. South of the bridge some distance was a grove, the gate of which opened onto the railroad right of way.

When the train stopped at the Blue Island depot a great many of the passengers, appellee among them, went south over the bridge and to the grove. A short time before five o'clock P. M., the crowd, appellee among them, started back to the depot and across the bridge to take the train. The train, while appellee was on the bridge, started to back toward her, when she turned and attempted to avoid the danger by running back south on the bridge; but the train gaining on her, she became very much excited, and a young man named Kotoski took hold of her and hurried her to the end of the ties of the bridge, from which both Kotoski and she were precipitated to the ground below, a distance variously estimated by the witnesses at from twenty-five to thirty-five feet. Kotoski and appellee were seriously injured by the fall. The speed with which the train backed is variously estimated by the witnesses at from two or three to ten miles per hour, appellant's witnesses testifying to two or three miles per hour. Charles DeLand, a brakeman and witness for appellant, testified that he was on the rear platform as the train backed south toward the bridge; that when the train started back he cleared the platform, to give him room, thinking he might want to use it; that when the rear end of the train got to within about 100 feet of the bridge, while backing, it almost came to a stop, and then started on; that he saw a number of people along the tracks and a few on the bridge toward the south; that just as the train struck the bridge he saw appellee and the other people on the bridge, and that appellee was then about the middle or north of the middle of the bridge, about fifty feet, or something like that, away; that she was running, going faster than a man could walk, and that she ran about fifty feet before she was knocked off. There is no evidence that any bell was rung or whistle sounded while the train was backing, and witnesses who testified on the subject said they heard none. DeLand testified that he whistled with his mouth all the way back. This witness further testified that signals are given to the engineer by means of the hands and arms, and also by pulling a rope which runs

through the cars, and by pulling a rope which lets air into the hose and blows a whistle, a signal to the engineer; that he made a rush to stop the train, but the crowd blocked him off.

Fagg, the engineer of the train, called by appellant, testified that the fastest the train backed was two or three miles per hour, and that, at the speed it was going, he could have stopped it in thirty feet, or half a car length, if he had received a signal, but that he got no signal.

A witness for plaintiff, who was on the same platform with DeLand, testified that he did not see DeLand do anything to stop the train.

As illustrative of the danger to people on the bridge from the backing train, one witness testified that when he saw the train approaching he was about one-third the length of the bridge from its south end, and the train eighty or ninety feet away from him, and that he ran back about twenty feet and jumped over the trestle to the ground, a distance of from fifteen to thirty feet.

A witness who saw the accident thus describes it:

" When she was about the middle of the bridge, when the train struck the bridge, she tried to run. She couldn't run. She must have got frightened. When the other young man went across over, tried to get her to run, and seeing there was no run in her hardly—the girl couldn't run hardly—she must have got excited, I suppose—he carried her; he saw he was in danger, then stopped and got on the side the best he could. He got on the side, standing on the ties. There was another young fellow tried to get on the train, and he didn't get on in time—quick enough—so he gave them a shove some way, but it didn't amount to much, for they balanced, because I saw they balanced back again and got safe, only for another strip which was sticking over the car and shoved them, and over they went."

There was nothing to obstruct the view toward the south, of one standing on the rear platform of the rear car. A witness testified that the track was straight, so that persons on the rear platform could see to the end of the bridge, and that he, witness, saw the persons on the rear platform when he was about 200 feet south of the south end of the bridge. This evidence is uncontradicted.

JESSE B. BARTON, attorney for appellant.

JOHN F. WATERS and JOHNSON & PEGLER, attorneys for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

Appellant's counsel contends that the appellee was not a passenger when the accident occurred, but was a trespasser on appellant's right of way, and that appellant owed her no duty beyond the duty to abstain from wanton or willful negligence; that the proof was insufficient to warrant a recovery; that improper evidence for appellee was admitted, that an improper instruction was given for appellee, and proper instructions asked by appellant were refused.

Even on the hypothesis contended for by appellant's counsel that the appellee was not a passenger but a trespasser on appellant's right of way, we are of opinion that the evidence is sufficient to sustain the verdict. The trestle bridge is 254 feet in length. DeLand, the brakeman, took his station on the rear platform of the train (which, in backing, was the front platform) when the train started to back from the depot. Evidently he took this place as a look-out. His own testimony shows this. He testified: " When I first started back, I cleared the platform. I thought that I might want to use it." The evidence is that the track was straight, and it tends to prove that DeLand might have seen the people on the bridge from at least a point 100 feet north of the bridge. He further testified that when he saw appellee she was about the middle or north of the middle of the bridge, about fifty feet from the train, and that she ran about fifty feet before she was struck. If she was fifty feet from him when he first saw her, and she ran south fifty feet after he first saw her before she was struck, then there was a distance of 100 feet in which to stop the train before reaching her; yet he gave no signal to the engineer to stop the train, although it might have been stopped within thirty feet, as the engineer testified. The day was Sunday, and the passengers went to Blue Island on a pleasure excursion; the crew of the train must have seen the crowd pass south

over the bridge when they alighted from the train at Blue
Island; and the brakeman, DeLand, seeing people come from
the south toward the train, about train time for Chicago,
must have known that they were coming to take the train
for the return trip.   No bell was rung nor whistle sounded
as the train backed, nor was any signal given to the engi-
neer to stop the train, although appliances for that purpose
were conveniently near to where DeLand, the lookout, stood.

In L. S. & M. S. R. R. Co. v. Bodemer, 139 Ill. 596, 605,
in which case it was conceded that the plaintiff was a tres-
passer, the court say :

"It was the duty of the engineer to exercise ordinary
care to avoid striking the deceased, even if he was a tres-
passer.   If it was impossible to stop the train in time, it
may yet have been possible to have warned the plaintiff of
his danger in time to enable him to get out of the way.
The engineer 'must use all the usual signals to warn the
trespasser of danger.' (2 Shear. & Red. on Neg., Sec. 483,
4th Ed.)   If the boy was 125 feet from the engine when he
stepped upon the track, did the engineer see him ?   It was
for the jury to answer this question.   The company did
not produce the engineer, who said that he did not
see the deceased, nor did it introduce any evidence upon
that subject.   It is not necessary to show by affirmative
testimony that the engineer's look was directed toward the
boy.   It is sufficient, if it appears from all the circum-
stances, that he might have seen him by the exercise of
reasonable diligence and ordinary prudence. · Why did he
not see him ?   The track was straight and clear and un-
obstructed for a long distance."

In the same case, p. 606, the court, referring to several
cases, defines willful or wanton negligence, substantially,
as such a gross want of care and regard for the rights of
others as to justify the presumption of willfulness or wan-
tonness.

In Pierce v. Walters, 164 Ill. 560, in which case it was
also admitted that the plaintiff was a trespasser on the rail-
road right of way, it was held that if the engineer was guilty
of a want of ordinary care to avoid injury to the plaintiff,
after discovering his presence on the right of way, the
plaintiff was entitled to recover.

We are of opinion that the jury was warranted from the evidence in finding not only that the lookout might, in the exercise of ordinary care, have seen appellee as she was walking north over the bridge, before the train, in backing, reached the bridge, but that, if the lookout had exercised ordinary care after he actually saw appellee, the injury would have been avoided.

We find no error in the admission of evidence or in the giving of appellee's instruction. Appellant's refused instructions are substantially included in instructions given.

It is assigned as error that the damages are excessive, but this objection is not made in appellant's argument and must, therefore, be deemed waived. Gordon v. Commissioners, etc., 169 Ill. 510; Interstate B. & L. Ass'n v. Ayers, 71 Ill. App. 529, 541.

The evidence shows that appellee's injuries are serious, progressive and permanent.

The judgment will be affirmed.